# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| EPICOR SOFTWARE CORPORATION,<br><br>    Plaintiff/Counterdefendant,<br><br>vs.<br><br>ALTERNATIVE TECHNOLOGY SOLUTIONS, INC.,<br><br>    Defendant/Counterclaimant. | Case No.: SACV 13-00448-CJC(RNBx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS** |

## I. INTRODUCTION

This case involves a dispute between Plaintiff Epicor Software Corporation ("Epicor") and Defendant Alternative Technology Solutions, Inc. ("Alternative") over Alternative's business providing implementation and consulting services to users of Epicor's enterprise resource planning ("ERP") software. Epicor filed the initial

-1-

complaint in this action on March 18, 2013, alleging violations of federal and state copyright, trademark, and false advertising laws, state unfair competition laws, and related causes of action. (Dkt. No. 1.) Alternative has asserted counterclaims for intentional interference with prospective economic advantage, misappropriation of trade secrets, defamation, defamation *per se*, attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and violation of California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200. (Dkt. No. 19 ["Countercl."].) Before the Court is Epicor's Motion to Dismiss Alternative's Counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 44 ["Pl.'s Mot. Dismiss Countercl."].) For the reasons stated below, Epicor's motion is **GRANTED**.[1]

## II. BACKGROUND

Epicor provides "industry-specific business software solutions," including a system of ERP software (the "ERP Platform"). (Dkt. No. 64, First Amended Complaint ["FAC"] ¶¶ 1–2.) The ERP Platform is a software system designed to function as a central hub for a company's operations. (*See* FAC ¶¶ 10–12.) Alternative provides implementation, consulting, support, and customization services to users of ERP software, including users of Epicor's ERP Platform. (Countercl. ¶¶ 8–17.) The ERP Platform is a complex software system that must be customized to fit each company's operations. (*See* FAC ¶¶ 10–14.) According to Alternative, a license for the ERP Platform costs upward of hundreds of thousands of dollars and installing the software can take months. (Countercl. ¶ 88; Dkt. No. 62 ["Def.'s Opp'n to Mot. Dismiss Countercl."] at 16.) Epicor also offers its own implementation and consulting service to users of its software products. (FAC ¶ 14.) In addition, Epicor has a program through which it certifies third-party contractors

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for June 24, 2013 at 1:30 p.m. is hereby vacated and off calendar.

to become Epicor "Authorized Partners," which entails special training by Epicor and access to copies of the ERP Platform and its training manuals for use in their consulting services. (FAC ¶ 15.) According to Alternative, it was in talks with Epicor to become an "Authorized Partner" through 2010 and 2011, but Epicor never approved a formal partnership. (Countercl. ¶¶ 23–33.)

Alternative alleges that prior to approximately December 2012 it had a good "working relationship" with Epicor, and Epicor has referred customers needing support for the ERP Platform to Alternative over the years. (Countercl. ¶¶ 12, 20.) Alternative claims that in December 2012 its third party recruiter interviewed an individual who was formerly a controller at Epicor for a controller position at Alternative. (Countercl. ¶ 44.) At the time, the individual was the spouse of an Epicor senior vice president. (*Id.*) The recruiter allegedly shared with this individual "information regarding Alternative's success, profitability, and growth." (*Id.*) Alternative asserts that this information got back to Epicor and became the motivation for Epicor bringing the instant lawsuit. (*Id.*)

## III.  ANALYSIS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. In considering whether to dismiss a case for failure to state a claim, the issue before the court is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Dismissal of a

complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### a. Attempted Monopolization

A claim for attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, requires the following elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456–57 (1993). In addition, a threshold inquiry in analyzing a § 2 claim is whether the claimant adequately alleges the existence of a "relevant market" and the defendant's market power in the relevant market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). Since the validity of a relevant market is ordinarily a factual determination, an alleged market may survive a Rule 12(b)(6) motion unless the complaint's definition of the market is "facially unsustainable." *Id.* at 1045. The relevant market is defined by the market for the product itself as well as all economic substitutes for the product. *Id.* Two factors considered in determining whether a product is an economic substitute are whether the product is reasonably interchangeable with the product at issue and the degree of cross-elasticity of demand between the products. *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In addition, an antitrust claimant is permitted to restrict the relevant market to one brand of the product at issue. *Id.* at 1049; *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992). For example, in *Eastman Kodak* the Supreme Court upheld a relevant market defined as companies that service Kodak photocopiers, "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts." *Eastman Kodak Co.*, 504 U.S. at 482. The Supreme Court also considered "market imperfections" that existed in the market for service of

Kodak equipment, including the information costs faced by consumers at the time of purchase and the costs involved in switching to a different photocopier brand. *Id.* at 473–77.

Here, Alternative has alleged a relevant market consisting of companies that provide implementation and support service for the ERP Platform. A consumer in this market, which would be a company that has purchased the ERP Platform, would not be able to choose to contract with a firm that provides consulting services for a different ERP software. Implementation and support services for different brands of ERP software are therefore not reasonably interchangeable, and Alternative has alleged a separate relevant market sufficient to survive a Rule 12(b)(6) motion. In addition, Alternative has alleged precisely the same "market imperfections" that were present in *Eastman Kodak*. Namely, Alternative alleges that consumers of the ERP Platform face high information costs at the time of purchase because the complexity of the software and the numerous ways it can be implemented make it significantly difficult for consumers to gauge the cost of implementation and consulting services. *See Eastman Kodak Co.*, 504 U.S. at 473–77. Even more significant are the alleged switching costs. Alternative alleges that the ERP Platform costs hundreds of thousands of dollars, takes months to install, and, given the software's central role in the functioning of a company's operations, switching to a different ERP software would result in substantial expense in disruption of business.

In addition, Alternative has adequately alleged anticompetitive conduct and specific intent to monopolize. "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Specific intent is typically inferred from a showing of the defendant's anticompetitive conduct. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011). These elements look to whether the defendant

used its market power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor," or whether the defendant's actions are justified by "valid business reasons." *Eastman Kodak Co.*, 504 U.S. at 482–83 (citation omitted). Alternative alleges that Epicor engages in anticompetitive conduct by coercing customers into using only Epicor Authorized Partners to provide service for the ERP Platform, including threatening to cut off their support and void their warranties if they use non-authorized service providers such as Alternative, as well as requiring independent contractors who work for Epicor to agree to not work for servicers that are not Authorized Partners. (*See* Countercl. ¶¶ 56–57, 86.) Moreover, Alternative alleges that it had a "good working relationship" with Epicor since Alternative's formation in 2009, and that Epicor had previously referred its customers to Alternative for their implementation needs. (*See* Countercl. ¶¶ 12–21.) This changed in December 2012, when, according to Alternative's allegations, Epicor was apprised of Alternative's growing "success, growth, and profitability," leading it to engage in the anticompetitive conduct alleged in the counterclaims. In other words, Alternative alleges that Epicor engaged in anticompetitive conduct to foreclose competition from Alternative with no otherwise valid business reasons. These allegations are sufficient to plead the anticompetitive conduct and specific intent elements of a § 2 violation.

Alternative's counterclaims, however, fail to adequately allege the "dangerous probability of monopolization" element of an attempted monopolization claim. Demonstrating dangerous probability of monopolization requires more than a showing of "unfair" or "predatory" tactics, it "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc.*, 506 U.S. at 459. Market power generally can be shown by actual harm to competition inflicted by the defendant, such as restricted output or supracompetitive prices, or by the defendant's dominant market share and barriers to entry in the relevant market. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Here, Alternative has adequately alleged the relevant market, as described above. However, Alternative has failed to allege any facts regarding Epicor's market power in the relevant market. There is no allegation of Epicor's market share in the market for implementation and service of the ERP Platform. There is no allegation that Epicor is able to charge supracompetitive prices for its service. Given the complete lack of any allegations regarding Epicor's market power, Alternative has failed to adequately allege the "dangerous probability of monopolization" element required to state a claim for attempted monopolization under § 2 of the Sherman Act.

### b. Unfair Competition

Alternative's counterclaim for violation of California's UCL is premised on its claim that Epicor engaged in anticompetitive conduct in violation of § 2 of the Sherman Act. Because the Court finds that Alternative has failed to state a claim for violation of the Sherman Act, Alternative's UCL claim must fail as well.

California's UCL prohibits business acts or practices that are "unlawful, unfair, or fraudulent." Cal. Bus. & Prof. Code § 17200; *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Where a plaintiff asserts a claim under the "unlawful" prong of the UCL based on alleged violations of antitrust law, and the antitrust allegations are held deficient, the UCL claim must also fail. *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866–67 (2001). In the context of an action by a competitor under the "unfair" prong of the UCL, the California Supreme Court has defined "unfair conduct" to mean "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

Here, Alternative fails to state a claim under the "unlawful" prong of the UCL because the allegations of unlawful conduct on which it is premised, violation of § 2 of the Sherman Act, are themselves insufficiently pled. *See Aguilar*, 25 Cal. 4th at 866–67. Alternative's claim under the "unfair" prong of the UCL is also deficient. As described above, Alternative has failed to allege conduct by Epicor that has had "effects comparable to or the same as the violation of [antitrust] law, or otherwise significantly threatens or harms competition." *See Cel-Tech*, 20 Cal. 4th at 187.

### c. Misappropriation of Trade Secrets

Alternative's counterclaim for misappropriation of trade secrets in violation of California's Uniform Trade Secrets Act ("CUTSA"), Civil Code section 3426 *et seq.*, fails because it has not alleged facts showing that the information at issue constitutes a "trade secret" under California law. Under the CUTSA, a trade secret is information that (1) derives independent economic value, actual or potential, from not being generally known, and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Alternative asserts that the Internet Protocol ("IP") address and port number of its cloud server ("Server Identification Information") constitute a trade secret. (Countercl. ¶ 68.) Alternative claims trade secret status for this information because with it an individual "would be in a position to hack into Alternative's cloud server and access Alternative's valuable and sensitive data." (*Id.*) Notably, Alternative does not allege that the Server Identification Information has "independent" economic value. Nor does Alternative allege that any of the "valuable and sensitive data" on its servers were actually misappropriated. Rather, it merely alleges that the Server Identification Information could allow an individual to gain access to such valuable data. Finally, Alternative's trade secret counterclaim is deficient because it fails to allege facts showing that it took reasonable steps to keep the information secret, apart from a conclusory statement that such steps were taken.

### d. Defamation and Defamation *per se*

Alternative's third and fourth counterclaims, for defamation and defamation *per se* under California law, arise from a news release published by Epicor in which it announced the filing of the instant lawsuit against Alternative and summarized the allegations in the Complaint. (*See* Countercl. ¶¶ 72–78.) A defamation action in California requires proof of the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). In determining whether a publication has a defamatory meaning, California courts apply a totality of the circumstances test to review the meaning of the language in context and determine whether it is susceptible of a meaning alleged by the plaintiff. *Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1337 (2009). The publication must be read as a whole, and defamation actions "cannot be based on snippets taken out of context." *Id.* at 1338 (quoting *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998)).

Epicor argues that Alternative's defamation claims fail because the news release is protected by California's litigation privilege and is entitled to the absolute defense of truth. California's litigation privilege, California Civil Code section 47(b), is broadly interpreted by California courts to protect any publication made "in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). The privilege applies to any communication "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* Communications to news media are not necessarily protected; however, communications "merely informing a third party of the pendency of the litigation" are within the scope of the privilege. *See*

*Cargill Inc. v. Progressive Dairy Solutions, Inc.*, No. CV-F-07-0349-LJO-SMS, 2008 WL 2235354, at *5–6 (E.D. Cal. May 29, 2008) (dismissing defamation claim based on news release announcing litigation); *eCash Techs., Inc. v. Guagliardo*, 127 F. Supp. 2d 1069, 1077 (C.D. Cal. 2000) (dismissing defamation claim based on letter to third party announcing lawsuit and summarizing claims). Epicor's news release qualifies as a communication informing third parties of the pendency of litigation subject to the protection of California's litigation privilege. The news release was made by Epicor, a party to this judicial proceeding, and was logically related to this action in that it merely summarized the bare allegations of the lawsuit.

Epicor's news release is non-actionable for the additional reason that it is true, protected speech. Truth is an absolute defense to any libel action. *Campanelli v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 572, 581–82 (1996). The defendant is not required to prove literal truth of the allegedly defamatory communication, so long as the imputation is "substantially true" so as to justify the "gist" or "sting" of the remark. *Id.* The news release merely announced Epicor's pending lawsuit against Alternative and summarized the allegations in the Complaint in generic terms, stating that the lawsuit "alleg[es] that Alternative by and through its executives and employees knowingly misappropriated and misused Epicor's intellectual property and proprietary and confidential information." (*See* Countercl., Exh. B.) Alternative takes issue with specific terms used in the news release that it argues are not fairly reflected in the Complaint. For instance, Alternative picks apart the sentence stating that the suit alleges Alternative violated Epicor's intellectual property rights by "accessing, duplicating, using, distributing, and creating derivate works of Epicor's copyrighted software and other intellectual property in violation of numerous federal and state laws," asserting that this statement is false because the Complaint does not specifically use the term "distributed" in its allegations. (Opp'n to Mot. Dismiss Countercls. at 6–8.) Comparing the news release to the allegations in the Complaint the Court finds that they are true or at least "substantially

true," making them non-actionable for defamation liability. *See Campanelli*, 44 Cal. App. 4th at 581–82.

### e. Intentional Interference with Prospective Economic Advantage

Alternative's counterclaim for intentional interference with prospective economic advantage alleges that Epicor interfered with Alternative's business relationships with its employees, its customers, and an independent contractor. (Countercl. ¶¶ 59–65.) To state a claim for intentional interference with prospective economic advantage a plaintiff must plead (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff, (2) defendant's knowledge of the relationship, (3) intentional acts by the defendant designed to interfere with or disrupt the relationship, (4) actual interference or disruption, and (5) economic harm to the plaintiff proximately caused by the defendant's act. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 380 n.1 (1995). The plaintiff must show that the interference was wrongful "by some legal measure other than the fact of interference itself." *Id.* at 379. "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard . . . . an act must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive." *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1545 (2007) (citation omitted).

Alternative alleges that Epicor interfered with its economic relationships because Epicor "intentionally crafted the independent contractor agreement to entice contractors to terminate their existing business relationships and cease working with entities, like Alternative, that are not Authorized Partners," and because Epicor published the news release Alternative claims to be false and defamatory. (Countercl. ¶¶ 61, 63.) In its Opposition, the sole ground Alternative asserts for properly pleading a wrongful,

unlawful act is that Epicor published the purportedly defamatory news release in violation of California Civil Code section 44 *et seq*. Given the Court's finding that the news release is not actionable defamation, this ground cannot provide the independent wrongful act necessary for Alternative's intentional interference claim. Although Alternative does not rely on Epicor's alleged interference with its independent contractors or employees in its Opposition, these grounds are pled in the counterclaim. (*See* Countercl. ¶¶ 60–64.) Nevertheless, neither of these bases save Alternative's intentional interference claim. The bare allegation that Epicor somehow "enticed" one or more independent contractors to work with it and its Authorized Partners rather than Alternative does not state any facts that constitute an independent wrongful act. Similarly, Alternative's allegation that Epicor "intentionally directly contacted Alternative employees" and "solicit[ed] their employment with Epicor," (Countercl. ¶¶ 49, 64), does not state an independent wrongful act sufficient to sustain a claim for intentional interference, *see Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152–53 (2004) ("[T]o recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act . . . that induced an at-will employee to leave the plaintiff . . . . [A] defendant is not subject to liability for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment.").

//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the foregoing reasons, Epicor's Motion to Dismiss Alternative's Counterclaims is **GRANTED**. Alternative shall file amended counterclaims consistent with this Order within twenty (20) days of the date hereof.

DATED: June 21, 2013

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE